USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/1/2022

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ROLEO BEVERAGE CORP. and LEONARD COSTA,

Plaintiffs,

-against-

PEPSI-COLA BOTTLING COMPANY OF NEW YORK, INC.,

Defendant.

1:22-cv-6921 (MKV)

**ORDER GRANTING PRELIMINARY INJUNCTION**

---

MARY KAY VYSKOCIL, United States District Judge:

Plaintiffs Roleo Beverage Corp. ("Roleo Beverage") and Leonard Costa (together, "Plaintiffs") bring this action against Pepsi-Cola Bottling Company of New York, Inc. ("Pepsi" or "Defendant") for breach of contract, and seek specific performance, a declaratory judgment, and a preliminary injunction. Before this Court is Plaintiffs' motion for a preliminary injunction [ECF No. 27] and Defendant's motion to compel arbitration [ECF No. 22]. For the reasons discussed below, both motions are GRANTED.

## BACKGROUND

Pepsi is a soft drink bottling and distribution company engaged in business in New York City, Nassau, Suffolk, and Westchester Counties. Declaration of Andrew GraBois ("GraBois Decl.") ¶ 5. In 1980, Plaintiffs entered into an agreement with Pepsi, which has been amended several times, for the exclusive right to sell and distribute Pepsi products in a defined territory (the "Distributor Agreement"). GraBois Decl. ¶¶ 6, 8, Ex. 1. Pursuant to this agreement, Plaintiffs have spent the past four decades building relationships with retailers and growing their business. Until recently, apparently this was all done without issue.

1

On July 11, 2022, Pepsi received notice from Target that two Roleo Beverage employees, named Mario and Gustavo, were prohibited from entering the Target store at 1863 Broadway, New York, New York (the "Broadway Target Store") and all other Target locations "[d]ue to the failure . . . to comply with the policies applicable to contractors working at Target."  Affidavit of Gilberto Montalvo, Jr. ("Montalvo Aff."), Ex. 1.  Four days later, on July 15, Pepsi brought Costa, the owner of Roleo Beverage (Montalvo Aff. ¶ 4), in for a meeting, during which Costa confirmed that he had been informed by Target on July 11 that Mario and Gustavo were banned from their stores.  Montalvo Aff. ¶¶ 7-8.  Costa further confirmed that, despite this development, those employees had assisted him in merchandising Pepsi products for other retail outlets in the intervening days.  Montalvo Aff. ¶ 8.

During the meeting, Pepsi also showed Costa security footage obtained from Target, which captured Mario and Gustavo shoplifting on three separate occasions:

- On May 27, 2022, Gustavo scanned and paid for four bags of potato chips at Target's self-checkout, but left with an additional bag of chips without scanning or paying for it.  Montalvo Aff., Exs. 2-3.

- On June 21, 2022, Gustavo and Mario stole three workout dumbbells from Target.  Mario concealed two of the dumbbells under an article of clothing, while Gustavo left the store with two dumbbells but only paid for one.  Montalvo Aff., Exs. 4-8.

- On June 27, 2022, Gustavo stole a pack of underwear by leaving the underwear near self-checkout and placing it in his bag after purchasing a watermelon.  Montalvo Aff., Exs. 9-13.

The security footage also showed Costa in or around the Broadway Target Store on June 21 and June 27, the dates of two of these shoplifting incidents.  Montalvo Aff., Exs. 14-15.  In response, Costa explained that he is the only one who drives the Roleo Beverage delivery truck and, as a result, he was at the Broadway Target Store on the days of each of the incidents.  Montalvo Aff. ¶ 10.  While Costa disclaimed knowledge of any wrongdoing, he admitted that he should have

had more accountability as to the activities of his employees, and he expressed his intention to terminate Gustavo and Mario after the meeting, which he did.  Montalvo Aff. ¶ 10; ECF No. 13 at 37.

On July 21, 2022, Pepsi sent Plaintiffs a Notice of Termination of Distributor Agreement (the "Termination Notice"), informing Plaintiffs that Pepsi would be terminating their Distributor Agreement effective August 20, 2022, due to the multiple instances of theft from a Pepsi client by two of Plaintiffs' employees.  GraBois Decl., Ex. 7.  In so doing, Pepsi relied on Sections 3 and 20 of the Distributor Agreement.  GraBois Decl., Ex. 7.

Section 3 of the Distributor Agreement sets forth the core responsibilities of the Distributor.  As relevant here, it requires the Distributor to "secure full distribution of the Beverages in the Territory and to that end . . . individually (*or by his or its own employees directly supervised by the Distributor*) at all times diligently promote the sale and distribution of Beverages to every appropriate outlet therein."  GraBois Decl., Ex. 1 (emphasis added).  It further requires the Distributor to "employ and train his own qualified personnel."  GraBois Decl., Ex. 1.

Section 20 of the Distributor Agreement provides the means by which Pepsi may terminate a distributorship.  That section states in pertinent part that Pepsi "may terminate this agreement" if, among other reasons, it determines that "the Distributor's failure or refusal to comply with one or more of the terms of this agreement . . . is serious enough to warrant the action."  GraBois Decl., Ex. 1.  Section 20 also provides that "[b]efore issuing any such termination notice, . . . the company shall give the Distributor reasonable opportunity to explain and excuse such failure or refusal."  GraBois Decl., Ex. 1.

The Termination Notice explained that two of Plaintiffs' employees were observed shoplifting inside Target at a time when Costa was also inside the Target and was responsible for "directly supervis[ing]" his employees. GraBois Decl., Ex. 7 (alteration in original). The Termination Notice further stated that Costa continued to employ the employees after being informed by Target on July 11 of the shoplifting incidents, and that while Costa did terminate the employees four days later, his "inexplicable delay in addressing this extremely serious matter constitute[d] a breach of [his] obligation, under § 3 of the Agreement, to employ qualified personnel and fully and adequately supervise [his] Employees." GraBois Decl., Ex. 7.

On August 3, 2022, Plaintiffs' counsel sent a letter to Pepsi disputing Pepsi's right to terminate the Distributor Agreement, claiming that the Distributor Agreement "requires the Company to arbitrate before terminating or taking adverse action against the Distributor." GraBois Decl., Ex. 8. In so doing, Plaintiffs relied on the Distributor Agreement's arbitration clause, which states that:

> Any and all disputes or disagreements between the Company and the Distributor concerning the interpretation of application of the provisions of this Agreement, shall be determined in arbitration before Mr. William J. Glinsman, and judgment upon the award rendered by the said Arbitrator may be entered in any Court having jurisdiction. . . . In no event shall the Arbitrator have the power to alter or amend the terms of this Agreement.

GraBois Decl., Ex. 2, ¶ 8.

On August 9, 2022, Pepsi's counsel responded to Plaintiffs by claiming that "the Distributor Agreement does not require arbitration prior to [Pepsi] terminating a distributorship," and that, pursuant to Section 20 of the Distributor Agreement, the "Company is merely required to give the distributor 'a reasonable opportunity to explain and excuse' his breach of the

4

Distributor Agreement." GraBois Decl., Ex. 9. The letter stated that Costa had been granted such an opportunity at the meeting that took place on July 15, 2022. GraBois Decl., Ex. 9.

## PROCEDURAL HISTORY

Plaintiffs commenced this action in New York State Supreme Court on August 12, 2022, with the filing of a Summons With Notice as permitted by New York law. Plaintiffs simultaneously sought an order to show cause with temporary restraints and a preliminary injunction barring Pepsi from terminating the Distributor Agreement, otherwise disrupting Plaintiffs' operation, or disparaging Plaintiffs to any of their vendors or customers. On August 15, 2022, Pepsi removed the action to the United States District Court for the Southern District of New York alleging diversity jurisdiction. [ECF No. 1].

The Court held a hearing on the Temporary Restraining Order application at which Pepsi agreed to refrain from terminating or otherwise interfering with the operation of Plaintiffs' distributorship through September 2, 2022. The parties memorialized the agreement in a stipulation dated August 19, 2022. [ECF No. 16]. That same day, Plaintiffs filed a complaint alleging breach of contract, and seeking specific performance, a declaratory judgment, and a preliminary injunction. [ECF No. 13]. On August 23, 2022, Pepsi filed its opposition to Plaintiffs' application for a preliminary injunction [ECF No. 20],[1] and Plaintiffs filed a reply three days later [ECF No. 25].

On August 25, 2022, Pepsi moved to compel arbitration. [ECF Nos. 22-24]. In so doing, Pepsi noted that while Plaintiffs had represented that they would not oppose arbitration, Plaintiffs refused to stipulate to Pepsi's request that absent good cause shown the arbitration hearing shall

---

[1] Pepsi responded to the application for a preliminary injunction as filed in state court. Per Rule 81 of the Federal Rules of Civil Procedure it carries here. We directed Plaintiffs to refile the application as a separate docket entry here, which they did. [ECF No. 27].

5

occur on or before December 31, 2022. [ECF No. 24 at 2]. Plaintiffs filed an opposition the following day, in which they did not dispute that the action belonged in arbitration, but contested Pepsi's requested hearing schedule, arguing that such scheduling issues should properly be reserved for the arbitrator. [ECF No. 26].

On August 31, 2022, the parties appeared for a hearing on the pending motions. Both sides confirmed that they were not requesting an evidentiary hearing, but each moved for the admission of the declarations and affidavits they had filed, which were received into evidence without objection.[2] The Court reserved decision. This opinion constitutes the Court's findings of fact and conclusions of law pursuant to Rules 52(a) and 65 of the Federal Rules of Civil Procedure.

## DISCUSSION

### I. MOTION FOR A PRELIMINARY INJUNCTION

"To successfully seek a preliminary injunction, a moving party must show four elements: (1) likelihood of success on the merits; (2) likelihood that the moving party will suffer irreparable harm if a preliminary injunction is not granted; (3) that the balance of hardships tips in the moving party's favor; and (4) that the public interest is not disserved by relief." *JBR, Inc. v. Keurig Green Mt., Inc.*, 618 F. App'x 31, 33 (2d Cir. 2015). Plaintiffs easily satisfy this test.

#### a. Likelihood of Success on the Merits

To succeed on their contractual claims, Plaintiffs will need to demonstrate that they did not violate Section 3 of the Distributor Agreement, *or*, in the alternative, that any violation was

---

[2] The following constitutes the evidentiary record in connection with the motion for a preliminary injunction: Declaration of Andrew GraBois [ECF No. 18]; Affidavit of Gilberto Montalvo, Jr. [ECF No. 19]; Affidavit of Leonard Costa [ECF No. 27-2].

not "serious enough" to warrant termination.[3]  Plaintiffs have demonstrated a strong likelihood of success.

Pepsi argues that Costa violated Section 3 of the Distributor Agreement by "fail[ing] to supervise his employees, Gustavo and Mario, such that they were permitted to walk the Target store without supervision," and by allowing those employees to continue working for several days after learning of their Target ban, in violation of the requirement to employ only qualified personnel.  [ECF No. 20 at 17-18].  But since Pepsi concedes that Costa was in the Broadway Target Store at the time of the incidents [ECF No. 20 at 1], its argument seems to be that Costa violated his duties by not following his employees' every move with hawk-like attention.  This is a long stretch.  Costa had a job to do, and it was not to babysit.  He had no reason to believe that his employees were shoplifting, and even if he had kept an abnormally close watch, the theft occurred in such a discrete way (*e.g.*, scanning four out of five bags of chips) that it might still have gone undetected.  This is not a case of repeated ransacking.

It seems similarly unlikely that Costa will be found to have employed unqualified personnel simply because he allowed Mario and Gustavo to continue their work for several days after learning of their ban from Target.  Once Costa watched the surveillance tape, and the wrongdoing was made evident, he acted swiftly in terminating their employment.  His four-day delay in doing so might very well be considered the result of careful diligence, and an adherence to some form of due process, rather than gross indifference.

In the event that Costa is found to have violated Section 3, Pepsi would still have to show that the violation was "serious enough" to warrant termination of the Distributor Agreement.

---

[3] Plaintiffs also argue that Pepsi breached the Distributor Agreement by refusing to promptly pursue arbitration *before* sending the Termination Notice.  But this issue is effectively moot; once the case is in arbitration, the only substantive issue will be whether the Distributor Agreement allows Pepsi to terminate the agreement due to the shoplifting incidents.

Such a showing would be difficult. While theft from a customer is no doubt a serious offense, the act that must be evaluated is not that of shoplifting (which Costa did not himself do), but that of negligent supervision or imprudent personnel decisions. To the extent that Costa can be found to have committed either of these infractions, he did so in the most minor and excusable way, such that he has a strong argument that his violation of the agreement should not be deemed "serious enough" to terminate a distributorship that Costa has diligently ran, apparently without any issues, for roughly four decades.

### b. Irreparable Harm

It is well established that "[l]oss of employment does not in and of itself constitute irreparable injury." *Savage v. Gorski*, 850 F.2d 64 (2d Cir. 1988). On the other hand, the injury suffered from the loss of a dealership or separate business, especially one that has been run for many years, is irreparable. *See Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2d Cir. 1970) ("[T]he right to continue a business in which [Plaintiff] had engaged for twenty years . . . is not measurable entirely in monetary terms . . . ."). The question in this case is whether the termination of the distributorship is more analogous to an employee having been fired or to a business being handicapped (or potentially destroyed).

Pepsi claims that Plaintiffs are effectively employees, analogizing the situation to that at issue in *Loveridge v. Pendleton Woolen Mills, Inc.*, 788 F.2d 914 (2d Cir. 1986). There, the Second Circuit held that a salesperson working as an independent contractor was not entitled to a preliminary injunction to enjoin the company's termination of his services because he was more like an employee than a dealership. *See Loveridge*, 788 F.2d at 916-17. The Second Circuit based this ruling on the fact that the salesperson was compensated in the form of commission, and that he "own[ed] no inventory," had no "accounts receivable," and had only two employees. Id. at 917. But "perhaps most important" to the Second Circuit's analysis was the fact that the

salesperson had an "exclusive territory" in which it had "no competition for the sale of [the company's] merchandise." Id. And, because the company had brought in "two replacement sales representatives to service the territory," should the salesperson "ultimately succeed on the merits of his underlying claim, he may regain his territory," which was "being continued and preserved for him." Id.

This case shares some notable similarities with *Loveridge*. Plaintiffs are not responsible for their own inventory, but rather, Pepsi provides Plaintiffs with the beverages that they distribute, and then Pepsi compensates Plaintiffs on a commission basis. [ECF No. 20 at 14]. Plaintiffs also serve an exclusive territory, with no competition for the sale of Pepsi products. Pepsi has stated that it will service Plaintiffs' route until the current dispute is resolved, and will immediately return it if Plaintiffs prevail on their claims. GraBois Decl. ¶ 19; ECF No. 20 at 15.

Critically, however, *Loveridge*'s analysis expressly contrasted the salesperson with "a beverage distributor [who] must hire a team of drivers and loaders." 788 F.2d at 917. This is unsurprising, given that just two years before *Loveridge* was decided, the Second Circuit had held in *Roso-Lino Beverage Distributors, Inc. v. Coca-Cola Bottling Co. of New York, Inc.*, 749 F.2d 124 (2d Cir. 1984) that the loss of a beverage distributorship (this one for Coca-Cola) "constitutes irreparable harm." Id. at 125-26. In so holding, the Second Circuit noted that the distributorship was "an ongoing business representing many years of effort and the livelihood of its . . . owners." Id. That is the precise situation we have here. Thus, whatever similarities this case shares with *Loveridge*, it is clearly governed by *Roso-Lino*, which establishes that the loss (even temporary) of a long-running distributorship constitutes irreparable harm.

### c. Balance of Hardships

The equities tip decidedly in favor of Plaintiffs. Pepsi intends to terminate Plaintiffs' forty-year distributorship, which has amounted to Costa's life's work. This would leave Costa

and his employees without income in the short term, and could harm Plaintiffs' business relationships, and potentially threaten the viability of the business, in the long term. The burden to Pepsi of briefly extending this long-running distributorship is negligible. *See Roso-Lino*, 749 F.2d at 126 (finding it was "unlikely that Coca-Cola [would] suffer greatly if the eleven-year relationship [was] continued for a short while"). There is nothing in the record to suggest that Pepsi has ever before had a problem with Plaintiffs, and there is little reason to suspect further issue now that Costa has terminated the two shoplifters who caused this whole debacle.

### d. Public Interest

The public interest is maintained by promoting adherence to the terms of the contract. As discussed above, these terms seem favorable to Plaintiffs in this case.

## II.    MOTION TO COMPEL ARBITRATION

The Federal Arbitration Act ("FAA") provides that written agreements to arbitrate are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Under Section 4 of the FAA, a party "aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration" may file a motion to compel, which a court must grant "upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue." 9 U.S.C. § 4. In deciding motions to compel arbitration, a court must consider: "(1) whether the parties have entered into a valid agreement to arbitrate, and, if so, (2) whether the dispute at issue comes within the scope of the arbitration agreement." *Ameriprise Fin. Servs., Inc. v. Beland*, 672 F.3d 113, 128 (2d Cir. 2011).

Both parties agree that the Distributor Agreement's arbitration clause governs this dispute and that, as a result, the action belongs before an arbitrator. The only issue of disagreement concerns whether this Court should order that the arbitration hearing in this matter occur on or

before December 31, 2022, absent good cause for delay. In support of this proposed timeline, Pepsi references the Supreme Court's statement that "the benefits of private dispute resolution" such as arbitration include "lower costs greater efficiency and speed." *Stolt-Nielsen S.A. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 685 (2010). But Pepsi fails to cite any case law in which a district court has dictated the schedule of an arbitration hearing. Without any compelling argument to the contrary, this Court agrees with Plaintiffs that all scheduling issues are properly reserved for the arbitrator.

## CONCLUSION

Accordingly, it is hereby ORDERED that Plaintiffs' motion for a preliminary injunction and Pepsi's motion to compel arbitration are both GRANTED. The Court hereby enjoins Pepsi from terminating the Distributor Agreement, otherwise disrupting Plaintiffs' operation, or disparaging Plaintiffs to any of their vendors or customers. The preliminary injunction will remain in effect until the assigned arbitrator issues a decision, at which point the preliminary injunction will lapse.

The Clerk of Court is respectfully requested to terminate the pending motions at docket numbers 22 and 27, and to stay this matter pending arbitration.

The parties are hereby ORDERED to file a letter updating the Court on the status of arbitration on November 1, 2022, and every ninety (90) days thereafter, until arbitration has been completed.

**SO ORDERED.**

**Date:  September 1, 2022**
**New York, NY**

_____
**MARY KAY VYSKOCIL**
**United States District Judge**